1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF OREGON

3  SMITH & NEPHEW, INCORPORATED, )
   and JOHN O. HAYHURST, M.D.,   )
4                                )
            Plaintiffs,          )  No. CV-04-29-MO
5                                )  No. CV-08-714-MO
        vs.                      )
6                                )
   ARTHREX, INCORPORATED,        )  April 5, 2010
7                                )
            Defendant.           )  Portland, Oregon
8  _____)

9

10

11

12

13                **Telephone Status Conference**

14              TRANSCRIPT OF PROCEEDINGS

15        BEFORE THE HONORABLE MICHAEL W. MOSMAN

16          UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

```
 1                           APPEARANCES

 2

 3   FOR THE PLAINTIFFS:      Mr. John M. Skenyon
                              Mr. Mark J. Hebert
 4                            Fish & Richardson, PC
                              225 Franklin Street
 5                            Boston, MA 02110-2804

 6

 7                            Ms. Susan D. Pitchford
                              Chernoff Vilhauer McClung &
 8                            Stenzel, LLP
                              601 S.W. Second Avenue, Suite 1600
 9                            Portland, OR 97204

10

11   FOR THE DEFENDANT:       Mr. Charles W. Saber
                              Dickstein Shapiro LLP
12                            1825 Eye Street, NW
                              Washington, DC 20006

13

14                            Mr. Anthony P. Cho
                              Carlson, Gaskey & Olds, PC
15                            400 W. Maple, Suite 350
                              Birmingham, Michigan 48009

16

17                            Mr. Peter E. Heuser
                              Kolisch Hartwell, PC
18                            520 S.W. Yamhill Street, Suite 200
                              Portland, OR 97204

19

20   COURT REPORTER:          Bonita J. Shumway, CSR, RMR, CRR
                              United States District Courthouse
21                            1000 S.W. Third Ave., Room 301
                              Portland, OR  97204
22                            (503) 326-8188

23

24   ALSO PRESENT:            Mr. John Schmieding

25
```

```
 1                      (P R O C E E D I N G S)
 2              THE CLERK:  Hello, Counsel.
 3              We are here today in Smith & Nephew v. Arthrex.
 4    Judge Mosman is presiding.
 5              Please state your appearances for the record.
 6              MR. SKENYON:  This is Jack Skenyon, appearing for
 7    the plaintiffs, Smith & Nephew and John Hayhurst.
 8              MR. HEBERT:  This is Mark Hebert, also appearing
 9    for the plaintiffs.
10              MS. PITCHFORD:  And Susan Pitchford, also for
11    plaintiffs.
12              MR. SABER:  This is Charles Saber, appearing for
13    defendant Arthrex.
14              MR. HEUSER:  Peter Heuser, also appearing for
15    defendant Arthrex.
16              MR. CHO:  Anthony Cho, also for defendant Arthrex.
17              THE COURT:  Mr. Schmieding, are you on the phone
18    also?  I had a record that --
19              MR. SCHMIEDING:  This is John Schmieding.  I'm on
20    the call, too.  I have it on mute, though.
21              THE COURT:  All right.  Thank you.  You can go
22    ahead and put it on mute again, unless my daughter is
23    calling in and I didn't know.
24              We're here on the parties' joint status report,
25    with some suggestions from each side as to how we ought to
```

1    proceed going forward.  I think the parties are in general

2    agreement on the meaning of the Federal Circuit's decision,

3    at least the bare meaning of it.  I have received your

4    suggestions.  I'll hear anything further you wish to add in

5    light of what others have said.

6            And so I'll start with Smith & Nephew.  Anything

7    further you wish to add?

8            MR. SKENYON:  No, not other than anything we put

9    in the report, no.

10           THE COURT:  And for Arthrex, anything further you

11   wish to add?

12           MR. SABER:  At least right now, not right now.

13           THE COURT:  I should note that as of today, the

14   Federal Circuit's mandate has been docketed, so that's

15   happened.  We've made some progress.

16           There are several questions.  The parties

17   certainly agree that the former definition of "resile" and,

18   for that matter, "resilience" has been altered by the

19   holding of the Federal Circuit.

20           There is disagreement, first of all, about whether

21   that Federal Circuit ruling puts other claim construction

22   rulings by this Court in play or not.  Smith & Nephew argues

23   that since no other claims were contested, prior rulings by

24   this Court are now law of the case.

25           I think that's true as far as it goes, with the

1    obvious exception that at appropriate points it's necessary

2    to plug in the new definition of "resilience" or "resile"

3    where necessary.

4        Arthrex goes a little bit further than that, at

5    least if I'm understanding their argument, to suggest that

6    other claim constructions now have to be reexamined in light

7    of the altered claim construction, and uses as examples

8    "forming a hole in the bone" and "lodging the member within

9    the hole."

10       I disagree that anything more than the new claim

11   construction from the Federal Circuit and plugging that

12   definition in where absolutely necessary in redefining other

13   claims is all that's going to happen here.  I'm not going to

14   reexamine other claim construction, not only because I don't

15   think it's a good use of the time at this late date, but

16   because I agree that, in essence, it's the law of the case.

17       So that's claim construction.

18       MR. SABER:  Your Honor, may I be heard briefly on

19   that?  This is Mr. Saber.

20       THE COURT:  Differently than what you've written?

21       MR. SABER:  Just to amplify a bit on what was

22   written, if I could.

23       THE COURT:  Go ahead.

24       MR. SABER:  The law of the case doctrine is a very

25   narrow -- it's a narrow doctrine and it is -- there are

1    many, many exceptions to the doctrine, that indeed if an

2    exception applies, it's an abuse of discretion not to follow

3    that.

4              Here there are at least two or three that do

5    apply.  We think that there is a change of circumstance and

6    a change in law, because the change of the claim

7    construction, which is a matter of law, if indeed we are

8    correct that it impacts upon these other two matters of

9    "forming a hole" and "lodging by pressing," then indeed I

10   think it's incumbent upon the Court to reconsider those

11   issues.

12             I will note that actually with "forming a hole,"

13   there really wasn't a construction.

14             With "pressing" -- or at least a construction that

15   went to this issue.

16             On "pressing," of course, there was.

17             But we think that in the way that the Federal

18   Circuit described how the '557 patent works -- that a

19   surgeon makes a hole and then presses into the holes, and

20   then the resilient legs of the holes (sic) are what expand

21   to secure the anchor within the hole -- that that is the

22   Federal Circuit's teaching from the patent that it's not the

23   expansion of the hole but the expansion of the legs that has

24   to cause the lodging, and that brings these other two

25   matters of "forming the hole" and "lodging by pressing"

directly into -- into being.

And since law of the case is a narrow doctrine, we believe that these changes make it incumbent upon the Court to reconsider those, reconsider on "pressing" and to have additional claim construction on "forming the hole."

THE COURT:  Thank you.  I'm not going to do so. We'll stick with the prior claim construction unless it's directly altered by the Federal Circuit's ruling.

The second issue is infringement, and the -- Smith & Nephew position is that the only remaining infringement question is whether the accused anchors meet the new definition of "resiles."

Arthrex suggests, without a lot of specificity, that there may be new infringement arguments that need to be considered.  If I understand the argument, it would be that new claim construction might give rise to new infringement arguments that would need to be considered.

I'm not going to have new claim construction.  I don't see new infringement arguments in play in this case, other than the question of whether I ought to issue some ruling on the merits on *BMC Resources*.

Arthrex contends that I ought to completely forego any examination beyond what happened earlier of -- excuse me, Smith & Nephew contends that I ought to forego any examination on the merits of *BMC Resources*, and Arthrex

1  contends that nothing, certainly in the Federal Circuit

2  ruling, prohibits me from doing so, and that much by way of

3  intervening events and changes in the law counsel me to do

4  so.

5          We are headed for dispositive motions of some

6  kind, and I will take briefing on the merits on the question

7  of *BMC Resources*.  When I say "on the merits," I guess I

8  should say directly on the merits, although I will invite

9  Smith & Nephew to go ahead and also brief, if it chooses to

10 do so, any argument that I should not reconsider for some

11 sort of law of the case reason *BMC Resources*, my ruling on

12 *BMC Resources* earlier, or that if I do so, I ought to

13 continue not on the merits but on a waiver basis to deny

14 Arthrex that argument.

15         But I am going to require from Arthrex, and a

16 response by Smith & Nephew also, direct briefing on the

17 merits of *BMC Resources* on their argument.

18         So I'm declining at this point to foreclose

19 dispositive motions briefing on *BMC Resources*.

20         That's infringement.

21         Smith & Nephew suggests that there are no new

22 validity arguments that should be raised and that the

23 Federal Circuit has affirmed this Court's ruling on prior

24 validity and unenforceability arguments.  And in light of my

25 ruling about claim construction, I don't see new validity

arguments that could be raised at this time.

Let's talk about summary judgment.  Again, from what I've said already, Smith & Nephew suggests it ought to be solely on the issue of whether the accused anchors infringe the '557 patent on the narrower definition of "resiles."  And I've suggested that in addition to that question -- in fact, I have some doubt about whether that question is susceptible to summary judgment or not, but in addition to that question, we'll also brief the *BMC Resources* question.

Smith & Nephew suggests that summary judgment briefing should be resolved based on evidence produced at the last trial only, and Arthrex suggests that it ought to be the full record from both trials.  And I agree with Arthrex.  I see no reason to limit summary judgment briefing to the evidence produced at the last trial.

Arthrex, of course, further contends that it ought to be based on expanded claim construction, with which I disagree.  And as I've said now already, I agree with Arthrex's position that summary judgment ought to include the *BMC Resources* issue.  So I know we'll have briefing on *BMC Resources*.

I want to turn briefly to the one part of summary judgment the parties seem to agree about, which is that we ought to have cross motions for summary judgment on whether

1    the evidence, even viewed in the light most favorable to the

2    non-moving party, fails to or absolutely shows infringement

3    under the revised claim construction.

4        Arthrex would like to move, from what I can tell

5    from the briefing at least, for summary judgment on the idea

6    that the new definition of infringement should result in

7    summary judgment on non-infringement in Arthrex's favor.

8        I have trouble figuring out how we get around, in

9    terms of summary judgment briefing on the question, how we

10   get around the Federal Circuit's, as I read it, the holding

11   that reasonable jurors could disagree, could find

12   infringement even under the revised claim construction.

13       So I'll turn to Arthrex first.  On what basis

14   would you be moving for summary judgment for

15   non-infringement in light of the Federal Circuit's new claim

16   construction?

17       MR. SABER:  Thank you, Your Honor.

18       I mean, there are actually several reasons why we

19   say that.  The issue in the Federal Circuit really was on a

20   very, very narrow record as it goes to this question because

21   Smith & Nephew had never made this argument that they made

22   at oral argument about harmless error.  So the Federal

23   Circuit simply just did not have the opportunity to have the

24   full record about the evidence that had been developed below

25   on the nature of the Smith & Nephew tests that allegedly

1    show resilience sufficient to lodge.

2         THE COURT:  Where does the Federal Circuit say

3    they didn't have the opportunity to do that?

4         MR. SABER:  Excuse me?

5         THE COURT:  Where does the Federal Circuit say

6    that it didn't have the opportunity to review the record?

7         MR. SABER:  Well, I don't think you'll find that

8    in the opinion.  I think that was -- there was a long oral

9    argument on there as well.  But we think that when the full

10   record is brought up, there are significant admissions by

11   Smith & Nephew that the kinds of tests that they're relying

12   upon simply cannot be used to show how much of the alleged

13   force came from resilience and how much of the alleged force

14   came from something else.  There is also several other

15   reasons why, but that's probably the single most important

16   one.

17        In addition, there was actually no evidence put in

18   by the -- by Smith & Nephew that there was sufficiency to

19   lodge under any of their tests.  What we did have was just

20   an attorney argument.  And, indeed, the -- for example, the

21   evidence that was developed in the full record is that the

22   parties agreed that the amount of resilience that you would

23   need to lodge is between 10 and 15 pounds.  None of that was

24   before the Federal Circuit.  None of that was, frankly,

25   appropriate to be before the Federal Circuit at the date we

1  had the argument.

2         There is also the fact that there are many factors

3  other than just the difference between -- this was on the

4  plastic versus metal, things other than resilience.  And

5  again, on a full record, which we believe that really what

6  the Court was instructing is that we don't have the evidence

7  here, and we think that it's appropriate on a full record

8  for this Court to consider whether in fact we should be

9  going forward or whether this matter can now be resolved at

10 this time.

11        THE COURT:  Turning to Smith & Nephew, I'm also

12 puzzled, thinking of summary judgment going your direction,

13 how I would grant summary judgment to Smith & Nephew without

14 going contrary to my rulings earlier for directed verdict or

15 other such -- for summary judgment, for that matter, or

16 perhaps, if I'm recalling correctly, post-trial motions.

17 I'm at a loss how I would come out differently without

18 essentially talking out of both sides of my mouth for

19 summary judgment on this narrower construction in Smith &

20 Nephew's favor.

21        MR. SKENYON:  Well, I think, Your Honor, that when

22 we're talking about post-trial motions, we're talking about

23 their post-trial motions.  They were asking you to rule for

24 non-infringement, and the argument there was that -- on our

25 side, was simply that there was not evidence for the jury to

conclude otherwise.  So I don't think that's quite the same thing as going against your ruling there, because as a practical matter, if you ruled for the fact that we were entitled to summary judgment on infringement, there would be some consistency with that.

I think from the point -- our point of view here is that based on the record that existed in the last trial -- and I disagree with Mr. Saber on some of the things he said as to what that record constituted and what was before the Federal Circuit -- that we had directed our attention towards establishing a significant level of lodging power that was attributed just to the resilience of their anchors based on the testimony actually of their expert witnesses and the tests done by their experts. Essentially, under the circumstances, while this was in fact set forth for the Federal Circuit in our briefing as to what that evidence was, the Federal Circuit just did kick it back to this Court.  So I don't think it's inappropriate to consider that.  Now, maybe after all is said and done, the Court still considers the fact that there's some genuine issue of material fact here, but as a practical matter, we think there certainly is a basis to make the motion in the first place.

THE COURT:  My real question was whether you view yourself as ever having made essentially the same argument

once already.

MR. SKENYON:  You know, I can't really answer that question right now.  I know that in connection with the post-trial motions, our argument was that there was sufficient evidence to support the verdict.

In terms of the directed verdict motion, I think we just made that in general, and the Court just denied all of those, but I don't remember much argument on the directed verdict motions at trial at this time.

THE COURT:  Thank you.

In terms of summary judgment, then, I will simply entertain briefing on the question of whether the accused anchors infringed the '557 patent on the Federal Circuit's narrower definition of "resile," and the *BMC Resources* question.  The parties are free to move for cross motions for summary judgment, and that will be our summary judgment phase of the case without any new claim construction phase.

The parties also have brought up the question of trial and damages.  I have a couple of questions about that. Let me come to those in a moment, though, because in connection with what might happen between summary judgment and trial, Arthrex at least has raised the issue of what to do about experts, and for that matter Smith & Nephew has suggested that if summary judgment is denied Smith & Nephew, that we ought to proceed on the prior expert reports without

1    any additional expert presentation.

2         I'm aware that I could wait until after summary

3    judgment one way or the other to go ahead and set this up,

4    but the parties have set themselves a fairly rapid exchange

5    of reports and the like, and I'm under the impression that

6    some prep work would need to be done in order to meet that

7    schedule.  So I'm going to take up now the question of

8    expert discovery, if any, following summary judgment.

9         First I raised the question -- from what you've

10   written, it appears that the parties are content to move

11   forward towards summary judgment simply based on the

12   existing record without reliance on anything new from any

13   experts.  Is that correct for Smith & Nephew?

14              MR. SKENYON:  Yes, it is, Your Honor.

15              THE COURT:  And for Arthrex?

16              MR. SABER:  Yes, Your Honor.

17              THE COURT:  Then that's what we'll do.

18         Assuming that both sides lose at summary judgment,

19   that I deny both sides' summary judgment, which is probably

20   a pretty safe assumption at this point, then what to do

21   about additional expert testing and reports?  As I've

22   mentioned, Smith & Nephew suggests that we could simply

23   forego anything new and that what Arthrex presented earlier

24   ought to be enough.

25         I disagree.  I agree with Arthrex's position that

it really couldn't have presented evidence earlier that
resilience, even if it contributed in part, was not
sufficient to lodge.  And that's the precise evidence that
it now wishes to present, evidence that if it had tried to
present it earlier, I would have blocked.

So we are going to need new expert reports.  I
don't know if we'll need new expert testing or not.  I'll
leave that to the parties.  But we will need new expert
reports to support whatever happens on new -- the new claim
construction, moving forward towards trial.

Arthrex has suggested that as to infringement,
which is the real issue now, that we ought to follow the
pattern of disclosure used in the second trial, and that as
to any other expert issues -- and I see none, I'm not
allowing any -- we ought to follow the pattern used at the
first trial.  After that presentation, it proposes a single
schedule for expert discovery.

So my question to Arthrex is, is that the schedule
you're suggesting for expert disclosure, testing and the
like, with regard to infringement?  And I'm looking now at
page 11 of the joint status report.

MR. SABER:  That's right.  That's our proposal,
Your Honor.  Again, with the first reports would be
simultaneous, 75 days after, if the Court were to deny both
parties' motions.

1           THE COURT:  And you're incorporating within that

2      the schedule you suggest on page 10 for inspection of test

3      materials and the like?

4           MR. SABER:  That's correct.  What we suggested, to

5      make clear, is that if parties do tests, that they produce

6      the information at the same time, and that if there's an

7      inspection, within 14 days, that's correct.

8           THE COURT:  For Smith & Nephew, since I am going

9      to allow additional expert reports in this case, do you have

10     any problem with the schedule laid out on page 11?

11          MR. SKENYON:  None with the schedule per se, but

12     with the procedure.

13          THE COURT:  What problem do you have with the

14     procedure?

15          MR. SKENYON:  Well, the problem with the procedure

16     was that last time, before the second trial, the parties

17     exchanged infringement reports at the same time, which was

18     fine.  Each of the reports included testing that the

19     expert -- the respective expert had done.  The rebuttal

20     reports which were exchanged at the same time were supposed

21     to be directed to criticisms of the testing that the other

22     expert had done.  In the case of Arthrex's expert, however,

23     there was a new round of testing in that.

24          As we bear the burden on this infringement

25     question, it is somewhat unfair, from our point of view, to

1    be confronted at that stage in the rebuttal reports with a

2    new round of testing by Arthrex that we cannot either

3    duplicate or respond to.  So if you're going to do it this

4    way, our suggestion would be that the rebuttal expert

5    reports do not include any new testing, or the alternative

6    would be if they include new testing, we get the last reply.

7         THE COURT:  And you mean new testing, not an

8    attempt to duplicate the testing of the opposing expert?

9         MR. SKENYON:  No, I would say not -- well, the

10   problem is when you say, "duplicate the testing of the

11   opposing expert," it depends on how you do that as to

12   whether that's new or not.  Did you change the parameters

13   any?  Did you use a different substrate?  Did you do

14   something else with that, makes that a little subjective

15   question as to what that testing is.

16        THE COURT:  All right.  Thank you.  Thank you.

17        I will adopt the schedule at page 11, with

18   incorporating the 14-day time line at page 10 regarding

19   testing materials, equipment and the like.

20        Smith & Nephew doesn't really have a problem with

21   the schedule, they have a problem with how it played out

22   last time.  I agree with that concern, and rebuttal expert

23   reports are not to include new testing.  They may include

24   precise duplication of opposing experiments or tests as just

25   a pure attempt to see if it can be duplicated.

1    What is meant by "expert discovery deadline" at

2    page 11?

3    MR. SABER:  Your Honor, it's Mr. Saber.  That's

4    for depositions following the reports.

5    THE COURT:  And any problem with that deposition

6    deadline from Smith & Nephew?

7    MR. SKENYON:  We don't see any, Your Honor.

8    THE COURT:  So I'll adopt those three parts at

9    page 11 to expert discovery, the initial simultaneous

10   exchange of expert reports and disclosure of testing and

11   experimental procedures and materials, with corresponding

12   opportunities to inspect by the opponents, rebuttal expert

13   reports, which do not include new testing, but may include

14   precise duplication of testing, and then any depositions to

15   follow the rebuttal reports by 60 days.  That's what we'll

16   do about experts, assuming both sides lose at summary

17   judgment.

18   I want to take up the question of damages and

19   trial briefly.  Again, recognizing that we're in a sort of a

20   hypothetical situation, I still think it might be fruitful

21   for all of us to move forward that far in the schedule.

22   Smith & Nephew suggests that if they win at

23   summary judgment, the Court ought to reinstate the prior

24   damage award.  And on that narrow scenario -- not more

25   generally, but just on the narrow scenario of Smith & Nephew

prevailing at summary judgment -- does Arthrex disagree with

that proposition that if Smith & Nephew wins, I reinstate

the prior damage award?

MR. SABER:  Yes, Your Honor, we do.  The judgment

has been reversed, and I -- we obviously have the right on

whatever record is now at trial, if there is subsequently a

trial, to contest the damages as well.

THE COURT:  All right.  Thank you.  Thank you.

I'm not sure I agree, but we'll cross that road if and when

we get to it.

And then on damages more generally, of course, I

think both sides agree that, assuming we go to trial, we

have incorporated into the trial the question of damages.

Yes, sir?

MR. SKENYON:  Your Honor, that would be Smith &

Nephew's position.  I think the Seventh Amendment would

require that.

THE COURT:  What Smith & Nephew further suggests

is that we ought to also move forward on the question of

supplemental damages from January 1, '06 to June 11, '08, in

order, I guess in part, to cure Smith & Nephew's cross

appeal which the Federal Circuit found moot.

And I'm not sure we're talking about the same

damage piece here, but Arthrex suggests that that is Smith &

Nephew simply inviting me to reconsider my prior ruling on

supplemental damages.

Am I understanding Arthrex's position correctly?

MR. SABER:  Yes, Your Honor.

THE COURT:  And your response for Smith & Nephew?

MR. SKENYON:  Well, it is -- it would be a question of if summary judgment was granted on our behalf on infringement, and the original one was -- the damages award was reinstated, there would be damages due from that earlier date, that January, I think, '06 date on forward, continuing to the present, actually.  And that would be required to be tried, I think, in a brief -- we suggest a brief trial to a jury.  It's not a question of the Court's previous ruling, it being revisited that in the previous trial the damages numbers weren't put in for a period of time because that's in effect superseded here.

THE COURT:  Why do you suggest that following this procedure would, as you put it, cure Smith & Nephew's cross appeal?

MR. SKENYON:  Well, because theoretically at that damages trial, we would put in all the missing damages numbers from 2006 up until the present day of that trial, and the issue on the cross appeal was that for some period of time, up and to the -- up until the trial, those damages numbers were missing and the Court would not issue any damages award for them.

1    So if the jury decided the damages question,

2  however it did, dealing with all the damages numbers, no

3  matter what they came up with, would eliminate the cross

4  appeal issue.

5    THE COURT:  All right.  Thank you.  I believe I

6  understand your -- each side's damages position better.

7    At trial itself, again assuming a denial of

8  summary judgment, Smith & Nephew suggests a trial on the

9  limited infringement issue plus some degree of damages, and

10  also consolidating with 08-0007 with experts limited to

11  prior reports.  That's the trial Smith & Nephew envisions.

12    Arthrex envisions a trial on infringement.  I've

13  made clear it's on the limited question of infringement.  We

14  may also have a trial question for the jury on the *BMC*

15  *Resources* issue.  It will not be limited to prior expert

16  reports.  And Smith & Nephew -- excuse me, Arthrex suggests

17  that we ought not to consolidate with 08-0007.

18    In my own view, the trial -- again, assuming a

19  denial of summary judgment, would involve the limited

20  infringement issue, plus *BMC Resources*, with new expert

21  reports, but no consolidation with 08-0007, since they're in

22  very different postures.

23    So with that in mind, the parties have suggested

24  not only a schedule for disclosure of experts, but a

25  schedule for moving forward through summary judgment.

1          Give me just a moment here.

2          (There is a pause in the proceedings.)

3          THE COURT:  So first let me clarify.  I said 0007.

4    It's actually all those zeros, 714.  I'm sure no one

5    misunderstood.

6          The parties have suggested a briefing schedule for

7    summary judgment, with summary judgment motions, cross

8    motions coming due May 14, 2010; oppositions, June 4, 2010;

9    and replies June 18, 2010.  I'm happy with that schedule.

10   I'll adopt it as the summary judgment schedule in this case.

11         I don't know how quickly we'll be able to get

12   summary judgment resolved here, but I'm willing to try to

13   entertain a trial date so that we can lock that in at this

14   point.

15         Have the parties had a chance to discuss potential

16   trial dates?

17         MR. HEBERT:  No, we haven't, Your Honor.

18         MR. SABER:  That's correct, Your Honor.

19         THE COURT:  Do you want to try to do that now?

20   You've set out a schedule going out quite some distance from

21   resolution of summary judgment before trial.  So I'm

22   guessing, without having done -- crunched the numbers, that

23   we're talking about a 2011 trial.  Is that right?

24         MR. SKENYON:  We didn't know what your schedule

25   was like, but I think we had been assuming that that would

be so.

THE COURT:  If I got the final brief the end of June, then I typically allow myself a maximum of four months to resolve summary judgment; that is, to assimilate the briefing and hold a hearing if necessary and then answer it. Assuming that occurred here, then we'd be at the end of October or the middle part of October for summary judgment. With the schedule we talked about a moment ago, essentially --

MR. SABER:  I think it's about six months for expert discovery, if I'm adding the numbers up right.

THE COURT:  That's about right, maybe five, but yeah, we'll call it six months later to finish up expert discovery.  And then you'd have witness and exhibit lists and the like.

So I'm happy to let you discuss that offline and propose dates to me.  That's far enough out that although I'm not completely blank, I have a pretty good selection of dates available.  I suspect if you gave me two or three dates that the parties could try this case, one of them would work for sure.

Do you want to do that or do you want to hammer it out right now?

MR. SABER:  May I suggest that the parties talk and by the end of the week see if we can either come to

1    agreement and/or if we have different suggestions, send it

2    by letter to the Court?

3          MR. SKENYON:  Or maybe multiple dates that we

4    could suggest.

5          THE COURT:  Well, that's what I'm asking you to

6    do.  Come up with at least two, maybe three dates.

7          I'm going to put you on hold for just a moment

8    here.

9          (There is a pause in the proceedings.)

10          THE COURT:  Counsel, the only sticking point for

11    me then is that in the first three weeks of May, I have a

12    big securities trial, but April is wide open, late March is

13    wide open, and if it had to be that, early June wide open.

14          So talk to each other and suggest by an e-mail to

15    Ms. Stephens dates that might work for trial in this case.

16          MR. SABER:  Do you have anything after June?  I

17    think the earlier dates are going to be too tight with the

18    expert.

19          THE COURT:  Later than June or in June?

20          MR. SABER:  Yeah, in June and going forward from

21    there.

22          THE COURT:  June is wide open.  Early July is

23    open.  I don't want to go any later than that.  I change

24    over law clerks in August.  I don't like to have a trial

25    bridge that.

1          MR. SKENYON:  If I may ask the Court, when is the

2     Rose Festival?  We seem to have a history of trying this at

3     the same time as the Rose Festival.

4          THE COURT:  You don't like all those drunken

5     sailors hanging out in the courtroom?

6          MR. SKENYON:  Too many wandered in last time, but

7     no.

8          MR. HEUSER:  May and June.

9          THE COURT:  Is that Mr. Heuser?

10         MR. HEUSER:  Yeah.  I think it's end of May or

11    early June.

12         THE COURT:  Early June mostly, that's right.

13         Mr. Heuser is a lot more familiar with these civic

14    festivals than I am.

15         MR. SKENYON:  We noticed that, Your Honor.

16         MR. SABER:  Your Honor, while we were waiting for

17    you, Mr. Skenyon and I realized we both do have time this

18    week, so we'll be able to get a letter to Ms. Stephens by

19    the end of the week.

20         THE COURT:  All right.  So let's shoot for June,

21    that should work, and then we have the rest of the schedule.

22         Anything further today from Smith & Nephew?

23         MR. SKENYON:  No, Your Honor.

24         THE COURT:  From Arthrex?

25         MR. SABER:  There was just one minor housekeeping

thing on the page limits on summary judgment.  I believe we
had come to an agreement, actually, and it just didn't get
reflected in the report for the 04 paper of 50 pages for
opening and response briefs and 25 for rebuttals.  I
apologize that that didn't get into the paper, but I believe
we had an agreement on that.

     THE COURT:  That's fine.  I tell people they can
exceed the page limits all they want.  I'm only going to
read 35 pages, but you can write as much as you like.

     Thank you.  That will be allowed.

     Anything further?

     MR. SABER:  No, Your Honor.

     THE COURT:  Thank you all.  Good day.

     MR. SKENYON:  Thank you.

     (Proceedings concluded.)

--oOo--


        I certify, by signing below, that the foregoing is
a correct transcript of the record of proceedings in the
above-entitled cause.  A transcript without an original
signature or conformed signature is not certified.



*/s/Bonita J. Shumway*                    *4/6/10*
_____        _____
BONITA J. SHUMWAY, CSR, RMR, CRR        DATE
Official Court Reporter